| | |
|---|---|
| DEBRA JOHNSON, <br><br> Plaintiff/Claimant, <br><br> v. <br><br> MARTIN O'MALLEY, <br> Commissioner of Social Security, <br><br> Defendant. | MEMORANDUM AND RECOMMENDATION |

This matter is before the court on the parties' briefs filed pursuant to the Supplemental Rules for Social Security Actions. [DE-11, -13]. Claimant Debra Johnson ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). The time for responsive briefing has expired, and the matter is ripe for adjudication. Having carefully reviewed the administrative record and the briefs submitted by the parties, it is recommended that the final decision of the Commissioner be affirmed.

## I. STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability and DIB on October 14, 2021, alleging disability beginning May 31, 2017, which was later amended to August 30, 2019.[1] (R. 17, 209–19). The claim was denied initially and upon reconsideration. (R. 97–112). A telephonic hearing before an Administrative Law Judge ("ALJ") was held on January 19, 2023, at

---

[1] Claimant previously filed a claim on August 18, 2017, alleging disability beginning May 31, 2017, which was denied by a different ALJ on August 28, 2019. (R. 80–96).

which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 35–79). On February 6, 2023, the ALJ issued a decision denying Claimant's request for benefits. (R. 14–34). On August 18, 2023, the Appeals Council denied Claimant's request for review. (R. 1–6). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d

2

438, 439–40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

## IV. ALJ'S FINDINGS

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant did not engage in substantial

3

gainful activity from the amended alleged onset date of August 30, 2019, through her date last insured of December 31, 2021. (R. 19). Next, the ALJ determined Claimant had the severe impairments of degenerative disc disease, osteoarthritis, fibromyalgia, essential hypertension, and obesity. (R. 18–19). At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20–21).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[2] with the following additional limitations:

> frequently climb ramps and stairs, balance (as that is defined in the Dictionary of Occupational Titles (DOT)), stoop, kneel, crouch, and crawl but occasionally climb ladders, ropes, or scaffolds; occasionally work at unprotected heights, around moving, mechanical parts, and in extreme cold.

(R. 21–28). In making this assessment, the ALJ found Claimant's statements regarding her condition were not entirely consistent with the medical evidence and other evidence in the record. (R. 22). At step four, the ALJ concluded Claimant could perform her past relevant work as a childcare provider. (R. 28–29). Alternatively, at step five, upon considering Claimant's age, education, work experience, and RFC, the ALJ determined there are other jobs that exist in significant numbers in the national economy that Claimant can perform. (R. 29–30).

## V. DISCUSSION

Claimant contends that in formulating the RFC the ALJ failed to apply the correct standard when evaluating her fibromyalgia. Pl.'s Br. [DE-11] at 4–12. The Commissioner contends the

---

[2] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

4

422).

Claimant returned to Dr. Sun in June 2022, due to increased problems with her lower back, and she reported that her medications were not as effective as they were initially. (R. 450). On examination, Claimant had "multiple fibro[myalgia] tender points" and was "exquisitely tender" on her right-side lower back. (R. 452). An MRI showed herniated discs at L4-5 and L5-S1 with moderate right neural foraminal narrowing. (R. 798). It was recommended she follow up with spine and pain clinics and she was prescribed a trial prednisone taper. (R. 453). Pain management notes from September to December 2022 indicate Claimant had an antalgic gait and required an assistive device/ambulated with a rolling walker, she was prescribed a trial of Savella (later changed to Naltrexone due to the cost of Savella), and she was referred to physical therapy. (R. 521, 564, 662–68). At a physical therapy visit in September 2022, it was noted that Claimant reported pain all over her body due to fibromyalgia, and she demonstrated limitations in strength and range of motion. (R. 549–50). Claimant participated in seven aquatic therapy sessions from October to December 2022. (R. 506–08, 513–15, 527–29, 704–06, 755–57, 833–35, 845–47). An EMG in December 2022 was abnormal for mild chronic right L4 radiculopathy. (R. 785). A follow up with the spine clinic in January 2023, noted Claimant was doing "fair," gabapentin was increased, and if the increased medication did not help she may benefit from right L4-5 far lateral discectomy or injection. (R. 899).

The ALJ summarized Claimant's testimony and treatment records, (R. 22–25), and specifically addressed Claimant's fibromyalgia as follows:

> Concerning her fibromyalgia, the claimant did report widespread pain prior to December 2021, and she did have elevated sed rate and CRP, positive ANA, and other inflammatory markers. However, she reported good results from gabapentin and meloxicam. She did not report a level of limitation to treatment providers consistent with needing to take two naps daily and being able to sit 5-10 minutes

7

ALJ applied the correct legal framework, and that the decision is supported by substantial evidence. Def.'s Br. [DE-13] at 6–17.

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 404.1545(a)(3); *see also* SSR 96-8p, 1996 WL 374184, at *5. "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96-8p). The ALJ must provide "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* (quoting SSR 96-8p); *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

In *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 96 (4th Cir. 2020) case, the Fourth Circuit observed that fibromyalgia is "a disease whose 'symptoms are entirely subjective,' with the exception of trigger-point evidence," and that "[P]hysical examinations [of patients with fibromyalgia] will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." The court held that "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence." *Id.* at 97.

5

Claimant testified at her January 19, 2023 administrative hearing that she experienced pain from several physical conditions, but that fibromyalgia was the most limiting followed by her back pain. (R. 22, 61). She explained that her fibromyalgia causes pain and stiffness in multiple areas of her body every day, but that some days are worse than others. (R. 50). Fibromyalgia also causes fatigue and inhibits her ability to concentrate. (R. 51). Claimant uses showers, gabapentin cream, and medication to ease her pain but on the worst days her pain is a nine out of ten. (R. 51, 68). Claimant uses a rollator to assist with walking because the fibromyalgia causes her to fall due to leg weakness but she can still only walk for ten minutes before needing to rest and cannot get up and down stairs. (R. 56–57).

Treatment records show that Claimant was diagnosed with fibromyalgia in 2016 by her primary care doctor, and she sought care with a rheumatologist for joint pain in April 2019. (R. 22–23, 321–26). She had been treated with gabapentin, which helped, and had previously received steroid injections, which helped a little, and Dr. Sun started Claimant on a trial of meloxicam. (R. 321, 325). At a follow up visit in July 2019, Claimant reported the meloxicam helped with her pain but did not last all day and made her acid reflux worse, and Dr. Sun noted that most of her symptoms were consistent with fibromyalgia with diffuse pain, she also had mild osteoarthritis in her hands and knees, she received an injection for trochanteric bursitis, and physical therapy was discussed. (R. 333, 337–38). At a physical therapy evaluation in August 2019, it was noted Claimant had ten falls in the last twelve months, using an assistive device could help balance and improve endurance, and a prescription would be requested from Dr. Sun. (R. 342–47). Claimant reported requiring assistance with all ADLs and that most activity was limited by pain and stiffness, aquatic exercise was recommended, and she attended two therapy sessions. (R. 348, 352–55). In November 2019, Claimant reported that her gabapentin worked well for her fibromyalgia. (R.

6

and stand 10-15 minutes. The claimant was also referred to aquatic therapy; however, prior to the date last insured, it appears she only underwent two sessions because she drove two hours to her appointments. She reported some benefit in these sessions, and is unclear why she did not seek similar services at a facility closer to her home.

The undersigned is aware that fibromyalgia cannot be established by the usual purely objective means such as laboratory tests (e.g. RA, ANA or Sedimentation Rate, etc.), x-rays, or MRI scans. However, while the claimant had pain, the pain was not so severe as to prevent the claimant from using her hands or ambulating in a normal fashion during the relevant period. Thus, such facts indicate that although she reports pain, she was able to walk normally, move her joints, exhibit full strength of her muscles, and remain active enough to avoid muscle disuse atrophy. The medical evidence suggests that, at most, the claimant's conditions limited her to a range of light work, a limitation provided in consideration of her obesity, which can exertionally and nonexertionally limit an individual pursuant to SSR 19-2p.

(R. 25). While Claimant contends the ALJ improperly considered normal examination findings when determining the severity and limiting effects of her fibromyalgia, the court finds no error warranting remand.

First, the ALJ found that Claimant reported good results from her fibromyalgia medications, and this is supported by the record. In July 2019, after Claimant started a trial of meloxicam, she reported that it helped with her pain but did not last all day, (R. 333); in August 2019, she reported her pain was a 4 out of 10, (R. 343); and in November 2019, Claimant reported that she was also taking gabapentin for her fibromyalgia and that it worked well, (R. 422). In September 2021, at a follow up visit with her primary care provider, Claimant reported fibromyalgia in different areas, but mostly in her hands, and that she took meloxicam and gabapentin as needed. (R. 401). The record does not reflect further complaints regarding Claimant's fibromyalgia pain prior to the date last insured of December 31, 2021, and later records, considered by the ALJ, (R. 24), largely reflect complaints regarding her other impairments of degenerative disc disease and osteoarthritis and that

8

her fibromyalgia was controlled with medication adjustments.[3] (R. 453 (June 1, 2022 – right sided low back pain was bothering her most); R. 663 (Dec. 9, 2022 – follow up with pain management regarding fibromyalgia and osteoarthritis after reporting increased pain in September and October, (R. 521, 561–66), and noting her reduced pain rated 4 out of 10 after starting a trial of naltrexone); R. 897 (Jan. 9, 2023 – noting chief complaint right sided leg pain and discussing possible L4-5 discectomy to alleviate pain)). The ALJ appropriately considered that Claimant's fibromyalgia was controlled with medication during the relevant period. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

Next, the ALJ found that Claimant did not report a level of limitation to treatment providers consistent with her testimony of needing to take two naps daily and being able to sit 5–10 minutes and stand 10–15 minutes. The ALJ discussed Claimant's August 2019 physical therapy note where she reported difficulty walking, weakness, and falls, and that she needed assistance with activities of daily living, and she was deemed a good candidate for aquatic therapy. (R. 23, 348). However, the ALJ also noted that prior to her date last insured, Claimant only attended two aquatic therapy sessions, even though she reported reduced pain after the session, (R. 23, 25, 352–54), and at subsequent primary care visits Claimant was noted to have no gait abnormality, only mild fatigue, and reported that she had lost weight through exercise and diet and that her fibromyalgia medication worked well and she was taking it sparingly, (R. 23–25, 399–425). The ALJ appropriately considered that the treatment records prior to Claimant's date last insured did not reflect the level of limitation to which she testified, and it is not the court's role to re-weigh the

---

[3] As the ALJ discussed, Claimant complained of increasing low back pain after the date last insured, and imaging in June 2022 revealed mild disc height loss and disc bulges at L4-5 and L5-S1 with foraminal narrowing, (R. 24–25), but Claimant's only assertion of error relates to the ALJ's evaluation of her fibromyalgia.

9

evidence. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citation omitted).

Finally, the ALJ found that during the relevant period, Claimant's pain did not interfere with her ability to walk normally, move her joints, exhibit full muscle strength, or remain active enough to avoid muscle atrophy. (R. 25). While *Arakas* held that an ALJ may not rely on the absence of objective medical evidence "even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia or some other disease that does not produce such evidence," 983 F.3d at 97, the ALJ here was considering Claimant's pain related to multiple conditions, not just fibromyalgia. Directly after noting Claimant's normal gait, strength, and joint movement, the ALJ stated that Claimant's "conditions" (plural) limited her to light work, and then noted that he also considered the impact of obesity on her RFC. (R. 25); *see Sutton v. O'Malley*, No. 0:23-CV-4661-CMC, 2024 WL 4100185, at *3 (D.S.C. Sept. 4, 2024) (concluding that when the ALJ is considering multiple diagnoses that are characterized by abnormal exam or lab findings in addition to fibromyalgia, it is not improper to consider clinical examination or laboratory findings in evaluating a claimant's subjective complaints of pain) (citing *Tanika W. v. Kijakazi*, No. CV 1:22-3691-RMG-SVH, 2023 WL 6050446, at *16 (D.S.C. Aug. 23, 2023), *adopted sub nom. Wallace v. Kijakazi*, 2023 WL 6049982 (D.S.C. Sept. 15, 2023)). Furthermore, *Arakas* does not require the ALJ to consider only a claimant's subjective statements, i.e., take the claimant's statements at face value where they conflict with other evidence in the record. *See Corbin v. Kijakazi*, No. 2:20-CV-00060-M, 2022 WL 990487, at *4 (E.D.N.C. Mar. 31, 2022) (finding ALJ's evaluation of claimant's pain did not violate *Arakas* where the ALJ did not require that subjective statements be supported with medical evidence but rather found that the claimant's statements were in some respects inconsistent with the medical and other evidence, including repeated findings of normal muscle strength, gait, tone, station, and balance); *Thomas v.*

10

*Kijakazi*, No. 2:21-CV-00019-D, 2022 WL 3209167, at *6 (E.D.N.C. July 20, 2022) (finding *Arakas* distinguishable where claimant suffered from fibromyalgia but the ALJ did not rely on diagnostic evidence to dismiss her allegations and rather noted conflicting evidence such as minimal examination findings, reported activities, and conservative treatment), *adopted by*, 2022 WL 3162594 (E.D.N.C. Aug. 8, 2022); *Patterson v. Kijakazi*, No. 1:20CV1030, 2022 WL 103884, at *6 (M.D.N.C. Jan. 10, 2022) (citing 20 C.F.R. § 404.1529(c)) (finding no error where the ALJ considered a claimant's reports of pain in light of the effectiveness of the claimant's treatment and ability to ambulate), *adopted by*, 2022 WL 904467 (M.D.N.C. Feb. 24, 2022), *aff'd*, No. 22-1325, 2023 WL 2136367 (4th Cir. Feb. 21, 2023)). Lastly, in *Arakas*, the claimant's rheumatologist, who had treated the claimant for fibromyalgia for years provided three opinion letters in support of the claimant's disability application, 983 F.3d at 92, whereas here none of Claimant's treatment providers opined that her fibromyalgia was disabling. Accordingly, the ALJ applied the correct legal standard and did not violate *Arakas* in evaluating Claimant's fibromyalgia.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that the final decision of the Commissioner be AFFIRMED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **November 5, 2024** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed by within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Submitted, this the 22 day of October, 2024.

Robert B. Jones, Jr.
United States Magistrate Judge